UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80582-CIV-MARRA/MATTHEWMAN

ANGELA MAHARAJ, as Natural Parent and
Guardian of Kameren Maharaj, a minor,

             Plaintiff,

vs.

GEICO CASUALTY COMPANY,

             Defendant.

_____/

## OPINION AND ORDER

THIS CAUSE is before the Court upon Defendant GEICO Casualty Company's Motion for Summary Judgment [DE 43]. The Court has carefully considered the motion and is otherwise fully advised in the premises.

## I. Background

GEICO issued an automobile policy, policy number 403651492, to Junie Telfort, effective January 31, 2007 to July 31, 2007. The policy provided Bodily Injury Liability ("BI") coverage in the amount of $10,000.00 per person and $20,000.00 per accident. [DE 42-1].

On May 17, 2007, Ms. Telfort entered an intersection, causing Surendra Maharaj to swerve his Ford Explorer to avoid an impact with Ms. Telfort's vehicle. The Explorer overturned multiple times. As a result of this accident, Kameren, Surendra's six year old son, had his left leg amputated from the knee down. [DE 42 at 1-2, DE 49 at 1].

1

Ms. Telfort left the scene of the accident.  She was arrested and pled guilty to leaving the scene of a crash and reckless driving causing injury to a person. [DE 42-3].

GEICO first became aware of this accident the next day, when one of its field representatives, Cindy Ruehl, saw an article in the newspaper, and determined that the accident involved a GEICO insured.  [DE 42 at 2, DE 49-2 at 16].  She forwarded the article to Gary D. Gertz, a Regional Claims Manager for GEICO, who reviews serious claims, [DE 49-2 at 12], and Mark Sugden, the Second Regional Claims Manager. [Id. at 7, 17-18].  The article indicated that GEICO's insured had run a stop sign; that she had fled the scene of the accident and been arrested later;  and that a six year old boy's left foot had been severed in the crash. [Id. at 18]. Mr. Gertz testified that GEICO would have wanted to resolve the claim as quickly as possible. [Id. at 21].  He testified, "That's our duty.  When liability is reasonably clear and damages indicate the policy limits should be paid, we want to pay our limits." [Id.].

Matthew Green was the GEICO adjuster assigned to this claim.  He testified that he recalled that GEICO had a reasonable opportunity to settle this case. [DE 49-1 at 13].

On May 22, 2007, Mr. Green sent a letter to Ms. Telfort advising her that the preliminary investigation revealed that the total claims may exceed her coverage with GEICO.  The letter stated, in part, "We will make every effort to settle all claims within your coverage limit.  If we are unable to do so, you are hereby notified that you may be exposed personally for any amount in excess of your limits."

On June 5, 2007, Kenneth N. Metnick, the attorney for Kameren Maharaj, wrote to GEICO and demanded that GEICO tender its liability policy limits within 30 days as compensation for the injuries sustained as a result of the negligence of its insured. [DE 42-9].

On June 8, 2007, less than a month after the accident, GEICO hand-delivered a letter to

Mr. Metnick containing a $10,000 check payable to Surendra and Angela Maharaj; a $10,000

check payable to the Maharajs on behalf of their son, Kameren; and proposed releases for each

claim. [DE 42-11].  The letter states that should he have any questions or concerns regarding the

enclosures, he should contact Matthew Green, who was the adjuster on the file. [Id.].  The

releases contained an indemnification and hold harmless clause which stated:

> IN FURTHER CONSIDERATION of said payment, Releasor(s) agree to defend, protect, indemnify and hold harmless Releasee(s) from any and every claim or demand, loss and expense of every kind, which may ever be asserted by him/her/them, on his/her/their account, or by anyone else, arising out of any bodily injuries and property damages sustained by Releasor(s) as set forth above, and Releasee(s) shall be entitled to plead this obligation and this Release in defense of any such claim. Releasor(s) specifically undertake and agree to defend, indemnify and hold harmless Releasee(s) for any claims, demands, liens, or assignments, relating to the medical care, diagnosis or treatment of Releasor(s), and any workers compensation claims, demands or liens now pending, or which may be asserted in the future, and any liens arising out of the legal representation of Releasor(s).

[DE 42-11 at 4, 6].

Mr. Gertz testified that at the time this claim arose, GEICO was using an indemnification

and hold harmless clause in its releases. [DE 49-2 at 25].  He testified that the clause was to

protect GEICO and its insureds from any additional claims that might arise after the release was

signed. [Id.]. He agreed that the effect of the indemnity clause would be to shift the duty to

defend as to any future claim by, e.g., a hospital, a medical provider, or a joint tortfeasor, from

GEICO to the injured claimant. [Id. at 25-28]. GEICO's releases were changed in 2008 on advice

of counsel to remove the indemnification and hold harmless clause. [Id. at 25].  Prior to this

revision, Mr Gertz testified that GEICO had no policy of which he was aware not to remove the

indemnification clause if requested. [Id. at 32].

3

On June 27, 2007, Mr. Green sent a letter to Ms. Telfort requesting a statement from her. The letter did not advise Ms. Telfort of Mr. Metnick's demand or that GEICO had tendered its policy limits. [DE 49-13].  When asked if there was a reason why the letter had not contained this information, Mr. Green testified, "No." [DE 49-1 at 24].

By letter dated July 10, 2007, Mr. Metnick wrote to Mr. Green stating in total:  "The check and release issued to Kameren Maharaj is unacceptable because of the inclusion of property damage and indemnification clause in the Release." [DE 42-14].  GEICO did not advise its insured, Ms. Telfort, of this response. [DE 49-1 at 29].

The next day, Mr. Metnick's letter was reviewed by Miriam Rivera of GEICO, who was covering for Mr. Green, who was out of the office. [DE 49-3 at 11-12].  Ms. Rivera read into the record at her deposition from her log entry relative to this letter, as follows:

> Received letter from claimant attorney advising that the check and release issued to Kameran Maharaj was unacceptable because of the inclusion of the property damage and the indemnification clause in the release.
>
> Called and spoke with Attorney Ken Metnick.  I asked for clarification.  Was he telling us that his clients were not accepting the tender?  Attorney advised that was not what he was saying.  He believes that the father will accept the tender as his injuries are not as significant as his son's.
>
> He does not know if his clients will accept the tender for the son, Kameran Maharaj, due to the severity of the injuries and the fact they are looking at a claim/suit against Ford due to the rollover. Clients may not want to let anybody out of this but nothing sure yet.  He did advise that this is a very emotional issue right now with the parents and they are not ready to make a decision right now.
>
> With regards to the release, he advised they would have no objections to the release if we removed the property damage and

4

the indemnification clause.  I asked them to make changes needed or if he had a release he would like to send us for review.  Attorney advised he would prefer we just take out the above and send them new releases for both clients.

I did advise him that per field adjuster's documentation, she advised his assistant that we were aware of the PD language on the release and advised her it was okay for them to cross this portion out as PD claim had not yet been resolved.  Attorney advised he has known Cindy for many years and knew she would not have a reason to lie about this.  Does believe she told assistant that.

Attorney advised he is not looking to allege bad faith here, just wants to make sure his clients' best interest is protected here.

I advised I would discuss with manager release issue.  Will send letter confirming that he has no objections to the release if PD and indemnification clause are removed and advised all understood.

Attorney also advised no need to reissue checks.  Releases were the issue.

[Id. at 18].  Plaintiff states that there exist genuine issues of fact relative to this conversation, as Mr. Metnick disputes the accuracy of certain portions of this summary. [DE 49 at ¶ 18, DE 43-4 at 60, ln. 21-23, 61, ln.1-12, 64, ln. 4-25 - 65, ln.1-15].  Mr. Metnick testified:

I am looking at this and I don't want to be nasty but it's absolutely absurd for GEICO or her to claim that I asked them to change the release and take the indemnification clause out, but I didn't want to settle. What did I ask them to take it out for?  Not to settle, and why was she looking to take it out if I wasn't going to settle. We wanted to settle, we were going to pursue Ford.  We were not thinking of going after someone with a ten thousand dollar policy.

[DE 43-4 at 62, ln. 13-21].

Ms. Rivera spoke with Kathy Watkins, who was Matthew Green's manager. [Id. at 20]. Ms. Watkins instructed her to send the inquiry to Carol Hambrick. [Id. at 21].  Ms. Hambrick sent a message to Ms. Rivera and Ms. Watkins on July 11, 2007 telling Ms. Rivera to prepare the

revised release with the attorney's reason for the change and send it to GEICO's claims home office legal for review. [Id. at 21-22].  Ms. Rivera had no independent recollection of having done this. [Id. at 22].  If she had done it, she would normally have put a note in the log. [Id.].  She acknowledged that the log did not indicate either way whether the instructions were followed. [Id.].  She also acknowledged that had she handled it, there would have been some type of transmittal of the revised release and the reason for the changes to GEICO's home office. [Id. at 22-23].

When asked at his deposition if he recalled that Mr. Metnick had asked that the indemnity and property damage language be removed from the release, Mr. Green testified that upon his return to his desk, he did. [DE 49-1 at 25].  On July 16, 2007, Mr. Green sent a letter to Mr. Metnick, which stated: "Please find enclosed the proposed releases per your request.  If in the event these releases are again unacceptable please provide to me any proposed releases for consideration.  I look forward to resolving this issue with you in the near future." [DE 42-15 at 1].  Although the letter represented that these new releases were in response to Mr. Metnick's request, only one of Mr. Metnick's concerns was addressed.  The new releases no longer had the references to the property claim; however, the indemnification and hold harmless agreement to which Mr. Metnick had previously objected remained. [Id. at 3, 5].

Mr. Green had no recollection of having sent these revised releases out or why they were sent out. [DE 49-1 at 26-27].  When asked whether he had followed Ms. Hambrick's instructions that the revised releases be sent to the legal department of the home claims office for review along with the attorney's reasons for the changes, he testified that he had not done that. [Id. at 28].

6

Mr. Metnick testified that he spoke with Mr. Green to discuss why the revised release still contained the indemnification and hold harmless provision.  Mr. Metnick testified that Mr. Green told him that "it was GEICO's policy to have those clauses in the release, it couldn't come out." [DE 43-4 at 23, ln. 9-13].   Mr. Green did not recall having this conversation, but he testified that he would not have told Mr. Metnick that GEICO would withhold the indemnification language on a release as it was not his position to do that. [DE 49-1 at 28-29].  He testified that he did not have the authority to remove the indemnification language and that would have had to go through the legal department of the home claims office. [DE 49-1 at 29].

Mr. Green testified that he did not recall seeing any indication in the file that Ms. Telfort had been advised regarding the settlement discussions or negotiations that had been ongoing with Mr. Metnick. [DE 49-1 at 29].

On August 22, 2007, GEICO received an executed release regarding Surendra's claim only. [DE 42 at 6, DE 49 at 2].  Mr. Metnick testified that Surendra signed the release against his advice. [DE 43-4 at 60, ln. 7-11]. Even though it contained the indemnification and hold harmless clause, Surenda was not injured as badly as Kameren, and his situation did not present the same concerns. [Id.].

Mr. Green did not follow up regarding the status of the revised release for Kameran for some period of time.  The length of time is disputed by the parties.  GEICO's Statement of Material Facts represents that Mr. Green left messages at Mr. Metnick's office on December 3, 2007, December 10, 2007, February 28, 2008 and May 8, 2008. [DE 42 at ¶21].  Plaintiff states that genuine issues of material fact exist as to the December 3rd and 10th dates. [DE 49 at ¶21]. Plaintiff points to Mr. Green's testimony that the calls on December 3rd and 10th related to the

check, not the release.  Mr. Green testified that after his July 16, 2007 letter, he did not follow up about the release for the rest of 2007. [DE 49-1 at 29-31].  Mr. Green testified that it was not until February 28, 2008 that he followed up with Mr. Metnick's office regarding the status of the release. [Id. at 31-32].

On February 1, 2008, Mr. Green wrote to Ms. Telfort to advise her that GEICO had not secured a release for her.  No details relative to the exchanges that had taken place between Mr. Metnick and GEICO were included.  [DE 42-17].  Mr. Green again wrote to Ms. Telfort on May 12, 2008 to advise her that GEICO's efforts to resolve Kameren's claim were unsuccessful and that she may receive legal documents.  [DE 42-18].

GEICO states that on May 9, 2008, Mr. Green received a voicemail message from Matthew Levy, an attorney with the Metnick, Levy & Long, P.A. law firm, stating that the Maharajs could not accept the policy limits due to Kameren's amputation and that Green then left a voicemail message for Ms. Telfort advising her of this. [DE 42 at ¶23].  Plaintiff states that there genuine issues of material fact exist relative thereto, but does not elaborate on what they are. [DE 49 at ¶23].

Mr. Metnick testified that he was surprised that GEICO would not remove the indemnification and hold harmless clause; so, he filed suit against Ms. Telfort in February, 2008. [DE 43-4 at 24, ln. 1-7, 92, ln. 9-10].  GEICO became aware of the lawsuit in July, 2008. [DE 42 at ¶25].

On October 13, 2008, GEICO filed a Proposal for Settlement in the amount of the policy limits. [DE 42-26].  The Release appended thereto no longer had the indemnification and hold harmless clause, but it did require Plaintiff to release anyone vicariously liable for Junie Telfort.

8

[Id. at 3].  This latter requirement had not appeared in the earlier proposed releases.

On February 22, 2012, a Final Judgment on Jury Verdict was signed awarding Angela Maharaj, as Natural Parent and Guardian of Kameren Maharaj, net compensation in the amount of $6,942,000.00.  GEICO was found liable for $10,000.00, the amount of its policy limits, and Ms. Telfort was found liable for the remainder of $6,800,626.90 [DE 42-32].

On May 5, 2012, Plaintiff commenced the instant action alleging that GEICO acted in bad faith for failing to settle the underlying claim when it should have and could have, had it acted in the best interest of its insured, Ms. Telfort. [DE 1-2 at 5].

GEICO now moves for summary judgment, claiming that no reasonable jury could find that it acted in bad faith in handling Kameren Maharaj's claim against Ms. Telfort.  GEICO claims that Plaintiff was never willing to settle her claim; therefore, GEICO never had a realistic opportunity to settle.  Plaintiff responds that GEICO's inclusion of and unwillingness to remove the release's indemnification and hold harmless clause was done in bad faith and genuine issues of material fact remain as to whether GEICO had no realistic opportunity to settle the claim.

## II.  Summary Judgment Standard

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

The Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-movant. Galvez v. Bruce, 552 F.3d 1238, 1241 (11th Cir. 2008).  "All reasonable doubts about the facts should be resolved in favor of the non-movant."

10

Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1280 (11th Cir. 2004)(citations omitted).

## III. Discussion

Under Florida law, "insurers have a common-law duty to exercise ordinary care and prudence in resolving their insured's liability." Valle v. State Farm Mut. Auto. Ins. Co., 394 Fed. App'x 555, 556 (11th Cir. Aug. 24, 2010) (citing Berges v. Infinity Ins. Co., 896 So.2d 665, 668-69 (Fla. 2004)). "An insurer breaches that duty when it acts in a way that unreasonably fails to mitigate or unreasonably exacerbates the insured's exposure to liability." Id. The "question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." Berges, 896 So.2d at 680.

"An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980).

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. . . . The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Id.

Bad faith conduct by an insurer in settling a claim renders the insurer liable for a judgment against an insured for "any amount in excess of the insured's policy limits." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 58 (Fla. 1995).

"Whether an insurer acted in bad faith generally raises an issue of fact for determination

11

by a jury." Johnson v. GEICO General Ins. Co., 318 Fed. App'x 847, 849-50; see also Berges, 896 So.2d at 680 ("Each case is determined on its own facts and ordinarily the question of failure to act in good faith with due regard for the interests of the insured is for the jury.") (internal quotation marks and citation omitted); Campbell v. Gov't Emp. Ins. Co., 306 So.2d 525, 530-31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact—not of law."). Summary judgment in bad-faith actions may nevertheless be appropriate "where the undisputed facts would allow no reasonable jury to conclude the defendant acted in bad faith." Johnson, 318 Fed. App'x at 850.

GEICO argues that it is entitled to summary judgment in its favor. It asserts that "responded quickly and appropriately in investigating the claim, kept its insured informed, and did everything within its control to settle the subject claim." [DE 43 at 9]. GEICO also argues that Plaintiff was never willing to settle her claim; therefore, GEICO never had a realistic opportunity to settle. [Id. at 9-10].

First, it should be noted that GEICO's position is inconsistent with the deposition testimony that was given by Mr. Green, the claims adjuster on this matter. Mr. Green testified that he recalled that GEICO had a reasonable opportunity to settle this case. [DE 49-1 at 13].

GEICO bases its position that it never had a realistic opportunity to settle upon the following testimony by Plaintiff at her deposition in this case:

Q.    At this point, June 5, 2007, would you have accepted $10,000 to settle Kameren's injury claim against GEICO's insured, Ms. Telfort?

A.    No.

12

[DE 43-3 at 28 ln. 15-18].   June 5, 2007 was the date of the letter from Mr. Metnick to GEICO demanding that GEICO tender the policy limits.   Plaintiff later submitted an errata sheet changing this testimony to "I would have followed the advise [sic] of my attorney." [DE 43-5]. Plaintiff's reason for the change was that she was confused by the question. [Id.].

GEICO urges this Court to ignore the errata sheet based upon the holdings in In re Trasylol Products Liability Litigation, No. 08-MD-01928, 2010 WL 5151579 (S.D. Fla. Nov. 16, 2010) and Reynolds v. Int'l Bus. Machines Corp., 320 F. Supp. 2d 1290 (M.D. Fla. 2004), aff'd, 125 Fed. Appx. 982 (11th Cir. 2004).   Acknowledging, as it must, that the Eleventh Circuit has not issued an opinion on this issue, GEICO urges this Court to adopt the reasoning in these two cases.

Fed. R. Civ. P. 30(e) permits a deponent to review his or her deposition transcript, and "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them."   Fed. R. Civ. P. 30(e)(1)(B).   The issue presented is what does it means for a deponent to be permitted to change the "substance" of his or her prior testimony?   The cases cited by GEICO hold that a deponent should not be permitted to file an errata sheet that materially changes the original deposition testimony.   Other cases adopt a broader view of the Rule.   See, e.g., Cultivos Yadran S.A. v. Rodriguez, 258 F.R.D. 530 (S.D. Fla. 2009)(discussing the latter view and cases supporting it).

The Court finds the line of cases adopting a broad interpretation of the Rule to be more persuasive and more consistent with the actual language of Rule 30(e).   GEICO argues that Plaintiff's professed reason for changing the transcript, namely, that she was confused by the question, is inadequate. [DE 43 at 16].   GEICO argues that there was no ambiguity in the

question that GEICO's counsel posed, and there was no hesitation or confusion in Plaintiff's

answer. [Id.].  The Court, however, agrees with the analysis of the Second Circuit in Podell v.

Citicorp Diners Club, Inc., 112 F.3d 98 (2d Cir. 1997), when it noted that:

>  Rule 30(e) allows deponents to make "changes in form or
>  substance" to their testimony and to "append any changes [that are]
>  made" to the filed transcript. . . . A deponent invoking this
>  privilege must "sign a statement reciting such changes and the
>  reasons given . . . for making them," . . . but "[t]he language of the
>  Rule places no limitations on the type of changes that may be
>  made[,] . . . nor does the Rule require a judge to examine the
>  sufficiency, reasonableness, or legitimacy of the reasons for the
>  changes" – even if those reasons "are unconvincing" . . . .
>
>  At the same time, when a party amends his testimony under
>  Rule 30(e), "[t]he original answer to the deposition questions will
>  remain part of the record and can be read at the trial." . . . "Nothing
>  in the language of Rule 30(e) requires or implies that the original
>  answers are to be stricken when changes are made. . . . This Court
>  has recognized that because "[a]ny out-of-court statement by a
>  party is an admission," a deponent's "original answer should [be]
>  admitted [into evidence]" even when he amends his deposition
>  testimony – with the deponent "[o]f course . . . free to introduce the
>  amended answer and explain the reasons for the change."

112 F.3d at 103 (citations omitted).  The Court, therefore, will not ignore Plaintiff's errata sheet.

Even if this Court struck the errata sheet, it would not have an effect on the outcome of

the pending motion, because, apart from her submission of the errata sheet, Plaintiff's deposition

created questions of fact as to whether she would have accepted $10,000 from GEICO to settle

her claim against Ms. Telfort.  In Trasylol, the Court noted that plaintiffs attempted "to justify

their corrections by stating that they were confused, but the Court does not discern noticeable

confusion in their original testimony, which was extensive **and consistent**." 2010 WL 5151579

at *8 (bold emphasis added).

14

Even without the errata sheet, Ms. Maharaj's testimony was not consistent on the issue of whether she would have accepted a $10,000.00 settlement from GEICO. After the testimony quoted above, the following exchange took place:

Q.     Okay. Ma'am, at - - at any point were you willing to accept GEICO's $10,000 to settle your son's claim?

A.     To settle his claim?

Q.     Yeah. Were - - at - - At any point in time during the  - - from the date of the automobile accident, which was May 17, 2007, all the way up through the ending of the underlying lawsuit, at any point in time during that time were you willing to take $10,000 to settle your son's injury claim?

A.     I let my attorney handle that.

Q.     Is - - I understand that you let your attorney handle the claim.  But my question is you personally as representing your son, were you willing to accept $10,000 to settle your son's bodily injury claim?
       . . .

Q.     And I believe earlier, ma'am, just for clarification, you - - when I asked you about the initial demand letter, your answer was no.
       So I'm asking at any point after this demand letter all the way up through the filing of the lawsuit would you have accepted $10,000 to settle your son's claim?
        . . .

A.     I let my attorney handle that.

Q.     And I understand that, ma'am.  But I'm asking you as a representative of your son, would you have accepted the $10,000 to settle your son's claim from the date of this demand letter through the date that you filed the underlying lawsuit?
       MR. BENRUBI: Form.  She - - she answered the question, and she was relying on the advice of her attorney.  Asked and answered.

       THE WITNESS: Talking to my attorney.  I talked to my attorney so . . .

[DE 43-3 at 36, ln. 20-38, ln.7].

Later in the deposition, the following exchange took place:

Q.     Ma'am, after filing a lawsuit against Ms. Telfort on February 8, 2008, would you have agreed to settle Kameren's bodily injury claim for the payment of $10,000?

A.     I relied on my attorney to make my decisions.

Q.     And I understand that, ma'am.  But I'm asking you would you have been willing on behalf of your son to settle his claim for the payment of $10,000 after the filing of the lawsuit on February 8th of 2008?

. . .

A.     I relied on my attorney to make my decisions.

[DE 43-3 at 41, ln. 12-24].

Mr. Metnick was also asked whether Ms. Maharaj was willing to settle Kameren's claim for the $10,000 in available coverage. [DE 43-4 at 56, ln. 18-22].  He replied:

A.     She was following my advice and we were looking into a claim against Ford and we saw GEICO had a ten thousand dollar policy and we didn't think that Judy Telfort, even if we wanted to go against her personally, was collectable [sic].  I mean, she only had a ten thousand dollar policy.  I think the information from GEICO was that she was like a nurse's aide or something . . . I mean, at that point, we were really looking for a claim against Ford for a rollover propensity of the car and that's what it is, that's the policy that Judy Telfort has . . . .

[Id. at 56, ln. 23-25 -57, ln. 1-9].

The Court finds that all of this testimony creates a factual question regarding whether Plaintiff was willing to settle her claim. GEICO essentially asks this Court to grant it summary judgment by ignoring this testimony; refusing to permit Plaintiff to change her testimony by use of the errata sheet; and relying solely upon the answer Plaintiff gave the first time she was asked the question.  The Court cannot do this.  The Court must view the facts in the light most favorable to the non-moving party.  In that light, Plaintiff's testimony that she would have relied upon her attorney creates a question of fact for the jury to determine whether Plaintiff would

16

have accepted the $10,000 from GEICO to settle her son's case against Ms. Telfort.

GEICO also argues that there is "extensive documentation" in the record contrary to Mr. Metnick's testimony that Plaintiff would have settled the claim had GEICO taken out the indemnification language from the release. [DE 43 at 17].  It is not the Court's function on a summary judgment motion to adjudicate which evidence is credible.  That is for the trier of fact.

GEICO argues that its "inclusion of the indemnity language in the release was there to protect its insured, Telfort." [DE 43 at 18].  Mr. Gertz, however, testified that the effect of the indemnity clause would be to shift the duty to defend as to any future claim by, i.e., a hospital, a medical provider, or a joint tortfeasor, from GEICO to the injured claimant. [DE 49-2 at 25-28].[1]

Mr. Metnick testified:

The indemnification clause was a major issue because the kid had major medical bills and we certainly did not want for him - - for a child to be responsible if somebody filed a bogus lawsuit . . . against GEICO and then there was a default judgment or GEICO didn't defend it and they would want this kid to come in and they would have to hire an attorney to defend or indemnify GEICO.

[DE 43-4 at 64, ln. 24-25 - 65, ln.1-6].

Mr. Metnick was asked:

Q.     The sole basis for the reason that the policy limits weren't accepted is the language in the release, correct?

and he answered:

A.     Yes.

---

[1]GEICO raises several arguments in its Reply brief as to why this testimony should be ignored. [DE 50 at 4-5].  First, these arguments are more properly made to a jury. Furthermore, GEICO fails to address a critical question which should be resolved by a jury, namely, why would Plaintiff take on the burdens imposed by the indemnification and hold harmless clauses that she otherwise would not have had for $10,000.

[Id.. at 70, ln.14-17].

Mr. Metnick also testified as follows:

Q.      Why was suit filed against Ms. Telfort?

A.      Because they wouldn't take the indemnification clause out . . . .

[Id. at 93, ln. 13-14].

GEICO argues that Mr. Metnick's failure to return its phone calls when it followed up regarding the check and release demonstrates that he was more interested in fabricating a potential bad faith claim than in protecting his client's rights. [DE 43 at 18].  However, GEICO's adjuster waited a minimum of five months to follow up as to the second release, and, taking the facts in the light most favorable to the non-movant, these calls were placed after Mr. Green had already told Mr. Metnick that GEICO would not remove the indemnification and hold harmless clause.

Mr. Metnick was asked whether GEICO tried to settle the claim for the policy limits after the complaint was filed. [Id. at 93, ln. 17-19].  He said that they did, and that they eventually removed the indemnification clause; however, they added a requirement that Kameren release anyone who might be vicariously liable for Ms. Telfort. [Id. at 93, ln. 20-25 - 94, ln. 1-6].  Mr. Metnick testified that this was "very odd." [Id. at 94, ln. 5-6].  He testified that by the time GEICO removed the indemnification clause, he would not have recommended to Plaintiff that she accept the policy limits.  By that time, he testified that there had been expenditures beyond the $10,000 limits, and GEICO never offered more than $10,000. [Id. at 97-98].

The Court finds that there is a factual question regarding whether GEICO refused to

remove the release's indemnification language at a point in time when the case may have settled within GEICO's coverage limits.  Mr. Metnick testified that Mr. Green told him that GEICO was unwilling to remove the indemnification language.   Assuming the jury believes this testimony, it could find that the refusal to remove this language from the release demonstrates the failure of GEICO to act in good faith. This is particularly the case where an overreaching release is proposed, which also is a factual question for the jury to resolve in this case.  Thus, summary judgment is inappropriate. See Otaola v. Cusano's Italian Bakery, 103 So. 3d 993, 997 (Fla. Dist. Ct. App. 2012) (an overreaching release can expose an insurer to a bad faith claim); United Auto Ins. Co. v.  Estate of Levine, 87 So. 3d 782, 784, 787 (Fla. Dist.  App. 2011) (affirming the denial of a motion for a directed verdict for the insurer where even though the full policy limits were offered, the release and hold harmless agreements were sweeping in their breadth and scope).

        The cases relied upon by Defendant do not compel a different result.  The dispute relative to the release in Bankston v. Illinois National Ins. Co., Case No. 6:01-cv-278-Orl-21 DAB (M.D. Fla. March 6, 2002), aff'd 54 Fed. Appx. 933 (11th Cir. Dec. 13, 2002) involved which parties would be released by the document.  The Court finds it inapposite.

        While the Boateng case rejected the plaintiff's claim of bad faith, it did so based on the insurer's prompt initiation of settlement negotiations with the plaintiff, and the plaintiff's failure to respond.  Boateng v. GEICO General Ins. Co., No. 10–CIV–60147, 2010 WL 4822601, at * 5 (S.D. Fla. Nov. 22, 2010).  The fact that the insurer offered the plaintiff a check along with a release was not what compelled the court's conclusion.  Id. at * 4.  Furthermore, Boateng did not have the kinds of questions of fact that are present in the instant case.

In Novoa v. Geico Indemnity Co., No. 12-80223-CV, 2013 WL 172913 (S.D. Fla. Jan. 16, 2013), aff'd, 2013 WL 5614269 (11th Cir. Oct. 15. 2013), the plaintiff alleged a breach of the duty of good faith when, among other things, the insurer provided a release with a check that covered the bodily injury claim and also released the property damage claims.   The Court found that the insurer had acted quickly to evaluate the potential claims and offered the claimant the full amount of coverage under the bodily injury section of the policy.  Id. at * 5.  The Court also held that the claimant was not misled by the "release's all-inclusive language because she did not sign the release and subsequently communicated her claim for additional compensation for property damage, to which the *[insurer] responded appropriately*." Id. at * 6 (emphasis added). In Novoa,, there is no discussion relative to an objection having been made to an indemnification provision in the release.   Furthermore, in the instant case, there is a factual question as to whether GEICO responded appropriately regarding Metnick's complaint about the release.

Also relied upon by Defendant is  Cardenas v. GEICO Casualty Co., 760 F. Supp. 2d 1305, 1307 (M.D. Fla. 2011).  There, the claimant sought the policy limits and a release that did not include any "hold harmless or indemnity language."  The insurer tendered the policy limits and, while the release contained the "hold harmless or indemnity language," it advised that the claimant could submit proposed changes to the release.  Id. at 1308.  The claimant did not respond, and the court held that the claimant could not rely on the release language to support a bad faith claim.  Id. at 1309.  In this case,  there are factual questions as to what occurred after GEICO sent the second release, which still contained an indemnification and hold harmless clause.

In Kim v. GEICO Casualty Co., No. 2:09–cv–667–FtM–29DNF, 2011 WL 2218894

20

(M.D. Fla. June 7, 2011), the court found that no reasonable jury could find that the insurer acted in bad faith for its failure to provide the claimant with a specific affidavit form requested by the claimant's attorney.  Id. at * 5.  The facts of Kim are completely inapposite to the instant case, where there is a question of fact as to whether GEICO would have removed the indemnification and hold harmless clause, which could have had repercussions to Plaintiff had it been left in the release.

Barnard v. GEICO Gen. Ins. Co., No. 5:10 cv 213/RS-CJK, 2011 WL 2039560 (N.D. Fla. May 25, 2011), is similarly inapposite.  The court in Barnard noted that it was clear that the material facts of the case were largely undisputed.  Id. at *1.  That is not the case here.  Barnard shares no facts in common with the instant case.

Plaintiff points to the insurer's obligation to advise its insured of settlement opportunities as an independent basis upon which bad faith can be found. [DE 48 at 15].  In light of Mr. Green's testimony that he did not recall seeing any indication in the file that Ms. Telfort had been advised regarding the settlement discussions or negotiations that had been ongoing with Mr. Metnick, [DE 49-1 at 29], there are questions of fact relative to whether Ms. Telfort was adequately kept apprised of settlement opportunities.  See, e.g., Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980); Odom v. Canal Ins. Co., 582 So.2d 1203, 1205 (Fla. Dist. Ct. App. 1991).  Plaintiff, however, has not pled any such claim in her complaint; therefore, this issue is not properly before the Court.  The only count in the Complaint alleges that GEICO "has been guilty of . . . failing to settle the subject claim when it should have and could have, had it acted in the best interest of its insured, Junie Telfort." [DE 1-3 at ¶23].

### IV.  Conclusion

As discussed herein, there exist material questions of fact as to whether GEICO acted in bad faith under a totality of the circumstances.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** that GEICO Casualty Company's Motion for Summary Judgment **(DE 43)** is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 11th day of February, 2014.

_____
KENNETH A. MARRA
United States District Judge

22